UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:

SÃO FERNANDO AÇÚCAR E ÁLCOOL
LTDA., SÃO FERNANDO ENERGIA I
LTDA., SÃO FERNANDO ENERGIA II
LTDA., SÃO MARCOS ENERGIA E
PARTICIPAÇÕES LTDA., AND SÃO PIO
EMPREENDIMENTOS E PARTICIPAÇÕES
LTDA.

Case No.: 19-21256-AJC

Chapter 15

     Debtors in a Foreign Proceeding.

_____/

### EXPEDITED MOTION FOR ORDER RECOGNIZING THE PRELIMINARY ASSET FREEZE ENTERED BY THE BRAZILIAN BANKRUPTCY COURT

### (EXPEDITED HEARING REQUESTED – Injunctive Relief Sought)

*The Foreign Representative seeks the recognition of a freeze order entered in the foreign main proceeding. Expedited consideration of this Motion is sought to avoid dissipation of assets and irreparable harm to the Debtors' bankruptcy estate.*

Vinicius Coutinho Consultoria e Perícia S/S Ltda. (the "Foreign Representative"), the duly appointed judicial administrator of the estates in bankruptcy of São Fernando Açúcar e Álcool Ltda. ("SF A&A"), São Fernando Energia I Ltda. ("SF Energia I"), São Fernando Energia II Ltda. ("SF Energia II"), São Marcos Energia e Participações Ltda. ("São Marcos") and São Pio Empreendimentos e Participações Ltda. ("São Pio") (collectively, the "Debtors" or the "São Fernando Group"), files this *Motion for Order Recognizing the Preliminary Asset Freeze Entered by the Brazilian Bankruptcy Court* (the "Motion"). The Motion seeks entry of an Order pursuant to 11 U.S.C. §§ 105, 1507 and 1521 of the Bankruptcy Code recognizing and enforcing orders entered by the Brazilian Bankruptcy Court (as defined below) in an incident proceeding relating to the Debtors' bankruptcy proceeding pending in the 5th Civil Court of the City of Dourados, in

1

the state of Mato Grosso do Sul, Brazil (the "Brazilian Bankruptcy Court") under case no. 0802789-69.2013.8.12.0002 (the "Brazilian Bankruptcy Case").

## PRELIMINARY STATEMENT

The Foreign Representative filed an action in the Brazilian Bankruptcy Court to pierce the Debtors' corporate veil and extend the effects of the Debtors' bankruptcy to seven Respondents (as defined below) related to the Debtors. In connection with that action, the Brazilian Bankruptcy Court granted a prejudgment asset freeze against the Respondents, enjoining the Respondents from transferring or otherwise dissipating their assets, including assets located in the United States. After five of the Respondents filed separate appeals, the Brazilian Appellate Court (as defined below) slightly modified the scope of the prejudgment asset freeze as to those Respondents, only to permit the management and use of the assets and the disposal of the proceeds of the assets.

To give effect to and enforce the freeze order as to the Respondents' assets in the United States, the Foreign Representative seeks the recognition and enforcement of the Brazilian orders pursuant to Chapter 15, which embody principles of comity and deference to foreign bankruptcy judgments. As described in detail below, the recognition of the freeze order is warranted under sections 1507 and 1521(a)(7) because (i) the Brazilian proceeding was fair and comported with American notions of due process, (ii) the prejudgment asset freeze obtained in support of the Brazilian proceeding is the type of relief that may be obtained by a trustee in the United States in support of an action for substantive consolidation, (iii) the interests of the Debtors, their creditors and the Respondents are protected, and (iv) there is no indication that this relief violates U.S. public policy. Alternatively, the Court should enter an order under section 1521(a)(3) in substantially the same form as the Brazilian asset freeze as the prejudgment asset freeze entered by the Brazilian Bankruptcy Court satisfies the applicable injunction standards.

## JURISDICTION AND VENUE

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and sections 109 and 1501 of the Bankruptcy Code.

2.    This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(O) & (P), and the Court may enter a final order consistent with Article III of the United States Constitution.

3.    Venue is proper in this district under 28 U.S.C. § 1410.

## RELEVANT FACTS

### A.    Procedural History

4.    The Sao Fernando Group filed for a reorganization proceeding under Brazilian law on April 13, 2013 and, after its creditors approved its reorganization plan, the Brazilian Bankruptcy Court approved the reorganization plan and granted the reorganization petition. D.E. 2.

5.    The Sao Fernando Group's reorganization efforts were not successful, and on June 8, 2017, the Brazilian Bankruptcy Court entered an order declaring the Sao Fernando Group bankrupt (the "Bankruptcy Order"). D.E. 2.

6.    The Sao Fernando Group's bankruptcy was in part due to mismanagement and abuse of the companies by its owners and controllers. At all relevant times prior to the Bankruptcy Order, the Sao Fernando Group was owned and operated by Jose Carlos da Costa Marques Bumlai ("Jose Bumlai"), Guilherme de Barros da Costa Marques Bumlai ("Guilherme Bumlai"), and Mauricio de Barros Bumlai ("Mauricio Bumlai"). These individuals, along with other members of the Bumlai family, used the Sao Fernando Group for their own benefit, enriching themselves to the detriment of the Debtors.

7.    On September 20, 2019, this Court entered an Order (the "Recognition Order")

recognizing the Debtors' Brazilian Bankruptcy Case as a foreign main proceeding under Chapter 15. D.E. 6. The Recognition Order also recognized the Judicial Administrator as the foreign representative of the Brazilian Bankruptcy Case. D.E. 6.

**B.**     **The Brazilian Bankruptcy Court Enters Freeze Orders**

8.     On August 25, 2020, the Foreign Representative filed a procedural incident motion under Case No. 0810455-77.2020.8.12.0002 (the "Veil Piercing Action") in the Brazilian Bankruptcy Court seeking to pierce the Debtors' corporate veil to extend the effects of the Debtors' bankruptcy to members of the Bumlai family and their companies: Jose Bumlai, Guilherme Bumlai, Mauricio Bumlai, Cristiane de Barros Costa Marques Bumlai Pagnonceli ("Cristiane Bumlai"), Fernando de Barros Bumlai ("Fernando Bumlai"), Agropecuaria CF Ltda. ("Agropecuaria"), and Donex Participacoes e Empreendimentos OSJC Ltda. ("Donex", and collectively, the "Respondents"). See Declaration of Marcelo Lucidi, attached hereto as **Exhibit "A"**, at ¶ 8.. The incident motion was accompanied with a request for urgent provisional relief to attach the Respondents' assets in Brazil and abroad, up to the limit of the Debtors' liabilities totaling 2,202,722,644.51 Brazilian Reals. *Id.*, at ¶ 11.

9.     On September 15, 2020, the Brazilian Bankruptcy Court entered an order (the "Freeze Order") partially granting the urgent provisional relief requested, ordering the attachment of all the Respondents' assets up to the aforesaid limit, except money and bank accounts. *Id.*, at ¶ 12. The Brazilian Bankruptcy Court deferred attachment on freezing the Respondents liquid assets upon a showing by the Foreign Representative that the real properties were not sufficient to satisfy the Debtors' debts. *Id.*, at ¶ 12-13.

10.     In the Freeze Order, the Brazilian Bankruptcy Court found that the Respondents abused their control of the Debtors for their own benefit, exercising control of the Debtors in

deviation of their corporate purpose. Ex. A, at Ex. 1. In so doing, the Brazilian Bankruptcy Court cited the following transactions, which it found to be "supported by detailed evidence":

      (a)     On March 1, 2014, the Bumlai family caused Debtor SF A&A to enter into a lease agreement with Agropecuaria, which was owned by Fernando Bumlai and Cristiane Bumlai, to lease an aircraft purchased by Agropecuaria in October 2013. SF A&A had no commercial reason for entering the lease. The lease required monthly payments of US$130,000.00, virtually the same amount as the monthly payment of US$131,305.80 owed by Agropecuaria to the seller of the aircraft.

      (b)     In 2013, Debtor SF A&A transferred approximately 1.5 million Brazilian Reals ("Reals") to Jose Bumlai by issuing checks to two companies owned by Fernando Bumlai and the wife of Mauricio Bumlai. Though the checks were purportedly issued to pay for services rendered, the companies did not provide any services in connection with the invoices. Upon receiving the checks, the companies endorsed the checks to Jose Bumlai, who cashed the checks at Banco do Brasil. In effect, Jose Bumlai withdrew cash from Sao Fernando`s bank account for his own personal benefit.

      (c)     In 2011, Jose Bumlai caused Debtor SF A&A to transfer 2 million Reals to Legend Engenheiros Associadoes Ltda., a company used by "professional money launderer" Adir Assad as part of his money laundering scheme. When investigated in connection with a criminal case against Mr. Assad, SF A&A provided "fraudulent explanations" for the transactions.

      (d)     In 2012, after Debtor SF A&A merged with TSF Logistica Ltda., a

company owned by Cristiane Bumlai and Fernando Bumlai, SF A&A discharged a debt of 18 million Reals previously owed by Jose Bumlai to TSF Logistica Ltda. Jose Bumlai never repaid the loan.

(e)    During 2011 and 2012, Debtors SF A&A and SF Energia II made payments of 27,385,141.10 Reals to Banco do Brasil and 4,297,920.61 Reals to Banco Daycoval to pay debts owed by Immbrax Industria e Comercio Ltda., a company owned by the Bumlais and their associates.

(f)    In 2016, while in reorganization, Debtor SF A&A entered into a lease agreement with B9 Logistica Eirelli, a company owned by the Bumlais to lease 68 pieces of equipment. Contrary to the agreement, however, 39 pieces of the leased equipment—overflow wagons leased at a rate of 100,000 Reals per month— were actually owned by SF A&A. Further, 20 of the wagons owned by SF A&A were subsequently written off as unserviceable and then misappropriated by the Bumlais.

(g)    In 2007, SF A&A entered into a "partnership" with Jose Bumlai for the planting, growing, and harvesting of sugarcane whereby SF A&A would pay for the costs and pay Jose Bumlai a portion of any profit made. The agreement was amended in 2013 changing Jose Bumlai's compensation to a set amount. Despite the agreement, however, all of the sugarcane produced by SF A&A under the "partnership" during 2013 and 2017 was sold by the Bumlais to SF A&A. Thus, in addition to bearing the costs of planting, growing, and harvesting its sugarcane, Debtor SF A&A paid Jose Bumlai for its own production. During the period of 2015 until the Debtors' liquidation in 2017, SF A&A paid the Bumlais

approximately 47 million Reals for 58,000 metric tons of its own production. In addition, SF A&A was forced to pay rates well above the market price.

(h)     In 2015, while in reorganization, SF A&A transferred 15 million Reals to Faccilytho Capital e Rentabilidade Ltda., a company that acquired various debts of the Bumlai Respondents. The transfers paid off various debts owed by the Bumlais, preferring the company over other creditors and, once again, acting for the benefit of the Respondents for no consideration in return.

11.     Though the Freeze Order did not grant the Foreign Representative's request to freeze the Respondents' liquid assets, the Brazilian Bankruptcy Court reconsidered its decision specifically for moneys held in bank accounts abroad. Ex. A, at ¶ 13. On September 21, 2020, the Brazilian Bankruptcy Court entered an order (the "Reconsideration Order") granting the Foreign Representative's request for reconsideration of the scope of the Freeze Order's freeze of the Respondents assets to include their liquid assets, in particular their financial assets held abroad. *Id.* The Brazilian Bankruptcy Court reasoned that "since there is the narrative of money in accounts abroad … with the possible intention of concealing assets, it is necessary to block [ ] financial assets, accounts, money of any kind, shares, debentures in any foreign country, especially in the Bahamas and in the United States of America." Ex. A, at Ex. 2.  Accordingly, the Court ordered the "blocking of all financial assets of the defendants abroad, especially in the Bahamas and in the United States of America, up to the amount of R$2,202,722,644.51." Ex. A, at Ex. 2. To enforce its order abroad, the Brazilian Bankruptcy Court directed that "[f]or that purpose, *a letter rogatory or other instrument shall be issued, as soon as possible, for compliance with the ["Reconsideration Order*"]." Ex. A, at Ex. 2 (emphasis added).

12.     Following Brazilian procedure, the Brazilian Court issued service of the Freeze

Order and the Reconsideration Order to each Respondent via postage mail. Ex. A, at ¶ 14. Shortly thereafter, Respondents Cristiane Bumlai, Fernando Bumlai, Agropecuaria, and Donex appeared in the Veil Piercing Action represented by counsel and filed defenses to the Veil Piercing Action. *Id.*

13.      As Mauricio Bumlai, Guilherme Bumlai and José Carlos Bumlai were not found at the mailing addresses indicated for service, the Brazilian Bankruptcy Court ordered their service through personal service to be effected by an officer of the Court. See Ex. A, at ¶ 36.

14.      On April 14, 2021, Mauricio Bumlai and Guilherme Bumlai voluntarily appeared in the proceedings and filed their defenses to the Veil Piercing Action. Ex. A, at ¶ 15. On May 28, 2021, Jose Bumlai voluntarily appeared in the Veil Piercing Action and presented his defense to the Veil Piercing Action. *Id.*  Accordingly, all Respondents have appeared and presented defenses in the Veil Piercing Action.

## C.      The Appellate Court Denies Respondents' Stay Pending Appeal

15.      Shortly after presenting their defense to the Veil Piercing Action, Fernando Bumlai, Cristiane Bumlai and Agropecuaria filed interlocutory appeals against the Freeze Order (as modified by the Reconsideration Order) to the Mato Grosso do Sul State Court of Appeals (the "Appellate Court").

16.      Fernando Bumlai challenged the Freeze Order before the Appellate Court under Interlocutory Appeal No. 1413886-76.2020.8.12.0000.   On October 23, 2020, the Judge Rapporteur entered an order (the "Fernando Appellate Order") rejecting Fernando Bumlai's application to stay the Freeze Order. Ex. A, at Ex. 3. In so doing, the Appellate Court concluded that Fernando Bumlai committed several actions "that ultimately caused huge losses to the bankrupt business group, apparently qualifying as commingling of assets and abusive and willful

use of the corporate veil of legal entities." Ex. A, at Ex. 3.

17.     The Appellate Court added:

Thus, for purposes of review of the request for preliminary injunction, considering, *on one hand*, the complexity of the case and the severe effects of the potential release of the assets already at this early moment, and, *on the other hand*, the need to ensure, before making any decision with potentially irreversible effects, prior and effective adversary proceeding, in favor of respondents/appellees, i.e. [the Debtors' estates], that it is necessary to uphold the freezing of assets ordered against appellant Fernando de Barros Bumlai, except with regard to the management and use/disposal of the proceeds from his assets, a total freezing of which could pose a risk to his and his family's proper support.

Ex. A, at Ex. 3. The Appellate Court therefore narrowly modified the asset freeze entered in the

Reconsideration Order for the limited purpose of permitting Fernando Bumlai's "management and

use" of his assets and "disposal of the proceeds from the assets," to avoid the risk to his family and

his family's proper support. Ex. A, at ¶ 17 & Ex. 3.

18.     Cristiane Bumlai and Agropecuaria also filed appeals against the Freeze and

Reconsideration Orders before the Appellate Court, which were docketed as Interlocutory Appeals

No.   1415037-77.2020.8.12.0000   and   No.   1415142-54.2020.8.12.0000,   respectively.   On

November 17, 2020 and November 20, 2020, the Judge Rapporteur entered orders rejecting the

their arguments to stay the Freeze Order.  The appellate orders, and translations thereof, are

attached to the Declaration as Exhibits 4 and 5, respectively.

19.     More recently, shortly after appearing in the Veil Piercing Action, Guilherme

Bumlai and Mauricio Bumlai jointly filed an interlocutory appeal against the Freeze and

Reconsideration Orders before the Appellate Court, which was docketed as Interlocutory Appeal

No. 1405509-82.2021.8.12.0000. On May 6, 2021, the Judge Rapporteur entered an order rejecting

their arguments to stay the Freeze Order.  The appellate order, and translation thereof, is attached

to the Declaration as Exhibit 6.

20.     The orders entered by the Judge Rapporteur on the appeals by Cristiane Bumlai,

9

Agropecuaria, Mauricio Bumlai and Guilherme Bumlai are similar to the Fernando Appellate Order and only modified the Freeze Order (as amended by the Reconsideration Order) to permit the continued "management and use" of their assets and "disposal of the proceeds from the assets," to avoid the risk to the Bumlai's family proper support, and to avoid risk to Agropecuaria's business activity. Ex. A, at Exs. 3, 4, 5, and 6. The appellate orders rejecting the applications to stay the Freeze Order by Fernando Bumlai, Cristiane Bumlai, Mauricio Bumlai, Guilherme Bumlai and Agropecuaria are hereinafter referred to as the "Orders Rejecting Stay Applications." The interlocutory appeals filed by these Respondents will be resolved by a panel of three judges of the Appellate Court, which have the authority to ratify or modify the Orders Rejecting Stay Application.

21.    The Freeze Order, the Reconsideration Order and the Orders Rejecting Stay Applications are attached hereto as the "Brazilian Orders."

**RELIEF REQUESTED**

22.    By this Motion, the Trustee respectfully requests that the Court enter an Order pursuant to sections 105(a), 1507 and 1521 of the Bankruptcy Code, substantially in the form of the Proposed Order, attached hereto as **Exhibit "B"**, recognizing the Brazilian Orders to institute an asset freeze of the Respondents in the United States.

**BASIS FOR RELIEF**

**I.    The Chapter 15 Statutory Scheme Provides the Court with Authority to Afford Comity to the Brazilian Orders**

23.    Chapter 15 incorporates the Model Law on Cross-Border Insolvency to provide an effective mechanism to deal with cross-border insolvency cases. 11 U.S.C. § 1501(a). Its objectives include (i) fostering the cooperation between United States courts and interested parties and foreign courts in cross-border insolvency cases; (ii) promoting greater legal certainty for trade

10

and investment; and (iii) the fair and efficient administration of cross-border insolvency cases that protect the interests of creditors, the debtor, and other interested parties. *Id.*

24.     "Chapter 15 directs courts to be guided by principles of comity." *SNP Boat Service S.A. v. Hotel Le St. James*, 483 B.R. 776, 785 (S.D. Fla. 2012); *see Ad Hoc Group of Vitro Noteholders v. Vitro S.A.B. de CV (In re Vitro S.A.B. de CV)*, 701 F.3d 1031, 1043 (5th Cir.2012) ("Central to Chapter 15 is comity."); *In re British American Ins. Co.*, 488 B.R. 205, 239 (Bankr. S.D. Fla. 2013) ("Central to Chapter 15 is comity."). These principles are embedded in the relief available under Chapter 15, which "provides courts with broad, flexible rules to fashion relief that is appropriate to effectuate the objectives in the chapter in accordance with comity." *In re Rede Energia, S.A.*, 515 B.R. 69, 91 (Bankr. S.D.N.Y. 2014).

25.     Accordingly, "[a]fter recognition, chapter 15 specifically contemplates that the court will exercise its discretion consistent with principles of comity." *In re British American*, 488 B.R. at 239 (quoting *In re Atlas Shipping A/S*, 404 B.R. 726, 738 (Bankr. S.D.N.Y. 2009)); *see also In re Agrokor*, 591 B.R. 163, 186 (Bankr. S.D.N.Y. 2018) ("Once a case is recognized as a foreign main proceeding, as has already occurred here, Chapter 15 specifically contemplates that the court will exercise its discretion consistent with principles of comity."); *In re Oi S.A.*, 587 B.R. 253, 264 (Bankr. S.D.N.Y. 2018) ("Chapter 15 … provides courts with broad, flexible rules to fashion relief that is appropriate to effectuate the objectives of the chapter in accordance with comity") (internal quotations and citations omitted). Indeed, section 1509(b)(3) expressly states that upon the foreign representative's recognition, the Court "must grant comity or cooperation to the foreign representative." 11 U.S.C. § 1509(b)(3).

26.     This is also evident in Chapter 15's legislative history, as Congress has stated that "comity is raised to the introductory language [of Chapter 15] to make clear that it is the central

concept to be addressed." *In re Oi*, 587 B.R. at 264 (quoting H.R. Rep. No. 109-31, pt. 1, at 109 (2005), as reprinted in 2005 U.S.C.C.A.N. 88, 172).

27.    In *Hilton v. Guyot*, the United States Supreme Court defined comity as follows:

'Comity' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws.

159 U.S. 113, at 141. "Comity is a common law rule by which courts in the United States give deference to foreign judgments." *In re Neves*, 570 B.R. 420, 426 (Bankr. S.D. Fla. 2017) (J. Isicoff).

28.    Importantly, "[i]n matters concerning bankruptcy the extension of comity enables the assets of a debtor to be dispersed in an equitable, orderly, and systematic manner, rather than in a haphazard, erratic or piecemeal fashion." *Daewoo Motor America, Inc. v. General Motors Corp.*, 459 F.3d 1249, 1258 (11th Cir. 2006) (internal citations omitted); *Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 247 (2d Cir. 1999) ("[W]e have also recognized—as we previously noted—the 'particular need to extend comity to foreign bankruptcy proceedings.'") (internal quotations omitted).

29.    The proponent of comity bears the initial burden to satisfy the comity considerations set forth *Hilton v. Guyot*, which considers the following:

(a) whether the foreign court was competent and used proceedings consistent with civilized jurisprudence;

(b) whether the judgment was rendered by fraud; and

(c) whether the foreign judgment was prejudicial because it violated American public policy notions of what is decent and just.

12

*Daewoo Motor America, Inc. v. General Motors Corp.*, 459 F.3d 1249, 1258 (11th Cir. 2006) (quoting *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1238 (11th Cir. 2004)).

30.    The first factor requires the proponent of comity to "describe the process by which the [foreign order] was obtained, why that process is not unfair, and why it does not offend the United States' notions of justice." *In re Neves*, 570 B.R. at 426. Once the proponent of comity satisfies this burden, the burden shifts to the party opposing comity to show that the foreign order "violates American public policy notions of what is decent and just." *In re Neves*, 570 B.R. at 427; *see also Tahan v. Hodgson*, 662 F.2d 862, 864 (D.C. Cir. 1981) (a foreign judgment may not be recognized on comity if its recognition would be "repugnant to fundamental notices of what is decent and just"). This burden is "high and unfrequently met" and is applicable only in "clear-cut cases." *Ackerman v. Levine*, 788 F.2d 830, 841 (2d Cir. 1986) (citations omitted).

31.    Further, all relief under Chapter 15 is subject to the public policy exception set forth in section 1506. Under section 1506, the Court may refuse "to take an action governed by [Chapter 15] if the action would be manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506. This public policy exception is narrow and "is intended to be invoked only under exceptional circumstances concerning matters of fundamental importance to the United States." *In re Petroforte Brasileiro de Petroleo Ltda.*, 530 B.R. 503, 507 (Bankr. S.D. Fla. 2015) (quoting *In re Vitro S.A.B. de C.V.*, 701 F.3d 1031, 1069 (5th Cir. 2012)); *In re Rede Energia S.A.*, 515 B.R. 69, 91-92 (Bankr. S.D.N.Y. 2014) ("[T]he public policy exception is clearly drafted in narrow terms and the few reported cases that have analyzed section 1506 at length recognize that it is to be applied sparingly.") (internal quotations omitted)).

32.    In considering comity, the relief granted in the foreign proceeding need not be identical to the relief that is available in the United States to be entitled to comity. *In re Rede*

*Energia S.A.*, 515 B.R. 69.

**II.    Recognition of the Brazilian Orders is Warranted Under Sections 1521(a)(7) & 1507**

      **A.    Legal Standard for Relief Under Sections 1521(a)(7) and 1507**

      33.    The Court has authority under sections 1521(a)(7) and 1507 to recognize and enforce the Brazilian Orders.

      34.    Section 1521(a) authorizes the Court to enter "any appropriate relief" "[u]pon recognition of a foreign proceeding … where necessary to effectuate the purposes of [Chapter 15] and to protect the assets of the debtor or the interests of the creditors." 11 U.S.C. 1521(a). It also lists a non-exhaustive list of "appropriate relief" that may be granted to a foreign representative after recognition, including "granting any additional relief that may be available to the trustee, except for relief available under sections 522, 544, 545, 547, 548, 550 and 724(a)." 11 U.S.C. § 1521(a)(7); *see In re Cell C Proprietary Ltd.*, 571 B.R. 542, 554 (Bankr. S.D.N.Y. 2017) (noting that the list of "appropriate relief" under section 1521(a) is "non-exhaustive").

      35.    The Court has "exceedingly broad" discretion to grant relief under section 1521(a). *In re Markus*, 610 B.R. 64, 76 (Bankr. S.D.N.Y. 2019); *In re U.S. Steel Canada Inc.*, 571 B.R. 600, 609 (Bankr. S.D.N.Y. 2017) (citation omitted). However, such relief may be granted "only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a). An analysis under section 1522 requires a balancing test of the respective interests. *See In re Oi*, 587 B.R. at 265 (citing various cases).

      36.    In addition to the relief available under section 1521, section 1507 empowers the Court to provide "additional assistance" to the Foreign Representative under the Bankruptcy Code or under other laws of the United States after recognition. 11 U.S.C. § 1507(a). Though the "interplay between the relief available under sections 1507 and 1521 is far from clear," some courts

analyze relief under these sections in a two-step approach: first considering relief under section 1521 and, if such relief is not available, then the Court may consider the relief requested under section 1507. *In re Olinda Star, Ltd.*, 614 B.R. 28, 47 (Bankr. S.D.N.Y. 2020) (citing various cases).

37.     To grant "additional assistance" under section 1507, the Court shall consider whether the additional assistance is consistent with principles of comity and whether it satisfies the following fairness considerations set forth in section 1507(b):

> (1)  just treatment of all holders of claims against or interests in the debtor's property;
>
> (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
>
> (3) prevention of preferential or fraudulent dispositions of property of the debtor;
>
> (4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and
>
> (5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 1507(b); *In re Agrokor*, 591 B.R. 163, 188-89 (Bankr. S.D.N.Y. 2018).

38.     In evaluating whether to award relief under sections 1521(a)(7) and 1507 to Brazilian bankruptcy orders, courts have determined that "Brazilian bankruptcy law meets our fundamental standards of fairness and accords with the course of civilized jurisprudence." *In re Rede Energia*, 515 B.R. 98; *see also In re OAS S.A.*, 533 B.R. 83, 103-04 (Bankr. S.D.N.Y. 2015) (noting that "Brazil has a comprehensive bankruptcy law that in many ways mirrors our own" and listing various similarities with the U.S. bankruptcy law).

39.     Further, courts have also held that Brazil's practice of entering *ex parte* orders, such as the Brazilian Orders, does not preclude recognition or otherwise affect the comity analysis. In *In re OAS*, the court recognized a Brazilian order consolidating the bankruptcy estates of three

15

SEQUOR LAW, P.A.

affiliate companies. 533 B.R. at 104-05. In evaluating objections to the recognition of the consolidation order, the court found that "the practice in Brazil of the different sides meeting *ex parte* with the Brazilian judge, is not manifestly contrary to United States public policy" and that "[e]ven United States recognizes exceptions to the general rule forbidding *ex parte* communications and procedures." *Id.* at 105. Importantly, in *In re OAS* reasoned that "[d]ue process is satisfied because these *ex parte* proceedings and orders are subject to *ex post* review, just as the consolidation order has been subject to *ex post* review in Brazil." *Id.*

40.     Similarly, in *In re Petroforte Brasiliero de Petroleo Ltda.*, the Brazilian court entered extended the effects of the debtor's bankruptcy over two related third parties. 542 B.R. 899 (Bankr. S.D. Fla. 2015) (J. Mark). After the foreign representative obtained recognition of the Brazilian bankruptcy, he sought discovery of various entities, including the third parties to whom the effects of the bankruptcy were extended to. *Id.* The third parties filed a motion to dismiss based on, among other things, that the extension order ran afoul of American due process notions because it was entered *ex parte*. *Id.* at 907. Relying on the reasoning in *In re OAS*, Judge Mark rejected this argument on the basis that the third parties were afforded the opportunity to present both argument and evidence on appeal, which they did, albeit unsuccessfully. *Id.* at 907-08.

41.     Courts have recognized and enforced foreign orders under sections 1521 and 1507 to give effect and ensure compliance with the foreign order.  Such is the case with foreign confirmation order or orders to facilitate their implementation. *In re Olinda Star, Ltd.*, 614 B.R. 28, 47-48 (Bankr. S.D.N.Y. 2020) (recognizing BVI scheme of arrangement and entering a permanent injunction against acts that would interference with the scheme); *In re Avanti Comms. Grp. PLC*, 582 B.R. 603 (Bankr. S.D.N.Y. 2018) (recognizing and enforcing UK schemes of arrangement which, among other things, granted third party releases); *In re Cell C Proprietary*

*Ltd.*, 571 B.R. 542, 551 (Bankr. S.D.N.Y. 2017) (recognizing South African arrangement sanctioned by South African court); *In re Rede Energia S.A.*, 515 B.R. 69, 93-94 (Bankr. S.D.N.Y. 2014) (recognizing Brazilian reorganization and confirmation decision and enjoining actions in the United States in contravention of the decision).

42.    Further, Courts have also recognized foreign bankruptcy orders under section 1521 "even if notice may not have been perfect." *In re Energy Coal S.P.A.*, 582 B.R. 619, 631 (Bankr. S.D.N.Y. 2018). In *Energy Coal*, the parties objected to the recognition of an Italian order approving the reorganization plan on the basis that they did not receive notice of relevant court documents, including dates to file objections. *Id.* at 625. However, despite their objections, the court approved recognition of the Italian order because, among other things, service was attempted under Italian law, which seemed sufficient under Italian law, and service was attempted at the email address previously used by the objectors when communicating with the foreign representative. *Id.* at 630-31.

43.    American courts have also afforded comity to *ex parte* interim injunctions. For instance, in *Gorsoan Ltd. v. Bullock*, No. 2020-020803-CA-01 (Fla. 11th Cir. Ct. Feb. 17, 2021), the court recognized an *ex parte* interim injunction order issued by a Cypriot court freezing Bullock's assets worldwide. In so doing, the court noted that Florida courts have a rich history of affording comity to foreign interim injunctions. *Id.* at p. 3 (citing *Amezcua v. Cortez*, No. 3D20-1649, at 6 (Fla. 3d DCA Jan. 13, 2021); *Cermesoni v. Maneiro*, 144 So. 3d 627, 629 (Fla. 3d DCA 2014); *Nahar v. Nahar*, 656 So. 2d 225, 229 (Fla. 3d DCA 1995)).

**B.    The Brazilian Orders Should be Afforded Comity Under Sections 1521(a)(7) & 1507**

44.    The Brazilian Orders should be recognized under sections 1521(a)(7) and 1507 because the orders (i) comport with the principles of comity, (ii) the prejudgment asset freeze

provided under the Brazilian Order is also relief that is available to the trustee under US law, (iii) the interests of the Debtors, creditors and Respondents are sufficiently protected, and (iv) the relief requested satisfies the fairness consideration set forth in section 1507(b).

> ### i. The Brazilian Orders Are Consistent with American Notions of Due Process and Effectuates the Purposes of Chapter 15

45.    The Brazilian Orders satisfy the due process considerations outlined in *Hilton v. Guyot* as the Veil Piercing Action was not an unfair process and does not offend the United States' notions of justice.

46.    As described by Mr. Lucidi, under Brazilian bankruptcy law, the Foreign Representative, as the judicial administrator of the Debtors' estate, has the duty to investigate and pursue any causes of action on behalf of the estate. See Ex. A., at ¶ 24. Accordingly, the Foreign Representative, as the judicial administrator, may commence an action, such as the Veil Piercing Action, to pierce the Debtors' corporate veil and hold the Respondents liable for the Debtors liabilities under Article 50 of the Brazilian Civil Code. *See id.*, at ¶ 25.

47.    The *ex parte* interlocutory relief in the Veil Piercing Action is a fair process as it affords the Respondents notice and the opportunity for a hearing. As indicated by Mr. Lucidi, to obtain provisional relief, Brazilian law requires a showing that the plaintiff has a likely probability of success on the merits of the underlying claim, that the plaintiff would be prejudiced if the relief is not granted, and that there is no risk that the provisional relief would cause irreversible damage. *Id.*, at ¶ 31-32. To obtain provisional relief on an *ex parte* basis, Brazilian law requires that the plaintiff satisfy a higher standard of proof. *Id.*, at ¶ 33. Following these considerations, the Brazilian Bankruptcy Court determined that an asset freeze of the Respondents assets was warranted as set forth in the Freeze and Reconsideration Orders.

48.    The Brazilian Orders also afforded the Respondents due process. As indicated by

Mr. Lucidi, under Brazilian law, the parties affected by *ex parte* proceedings are subsequently notified of any order entered in the proceeding by mail and, if unsuccessful, by personal service by an officer of the court. *Id.*, at ¶ 35-36. Such notification affords the party affected by an *ex parte* order the opportunity to challenge such order. *Id.* This procedure was followed in the Veil Piercing Action, in which the Court issued service to the Respondents, which resulted in the appearance of all of them in defense of the Veil Piercing Action and the appeal by five of them of the Freeze Order. *Id.*, at ¶ 14-15. Accordingly, Respondents ability to obtain *ex post* review of the Freeze and Reconsideration Orders satisfies due process. *See In re OAS*, 533 B.R. at 104-05 (noting that the *ex post* review of *ex parte* proceedings is enough to satisfy the due process requirement); *In re Petroforte*, 542 B.R. 907-08 (recognizing *ex parte* Brazilian order on the basis that the defendants affect by the *ex parte* order had ability to appeal the order).

49.     The Brazilian Orders were not rendered by fraud. None of the appellate orders address any allegations of fraud or otherwise suggest any wrongdoing.

50.     Further, the requested relief also effectuates the purposes of Chapter 15, particularly, fostering the cooperation between the United States bankruptcy court and its counterpart in Brazil, as the failure to recognize the Brazilian Orders will preclude enforcement of the orders in connection with the Respondents' assets in the United States. In turn, this relief preserve the status quo until the adjudication of the Veil Piercing Action.

### ii.     The Prejudgment Asset Freeze in Support of the Veil Piercing Action is Similar to Relief that Could be Obtained by a Trustee

51.     Further, the prejudgment asset freeze requested in support of a motion to extend the effects of a bankruptcy is relief that is available to a bankruptcy trustee.

52.     The relief requested in the Veil Piercing Action—to extend the effects of the Debtor's bankruptcy to others—is similar in nature to a claim for substantive consolidation. As

indicated by Mr. Lucidi's Declaration, an action to pierce the debtors' corporate veil under Article 50 of the Civil Code has the effect of holding a non-debtor liable for the debtor's liabilities. Ex. A, at ¶ 26. Similar to the relief sought in the Veil Piercing Action, "under the principle of substantive consolidation, the assets of two or more related entities may be pooled together and the liabilities may then be satisfied from this common pool of assets." *In re S&G Financial Servs. of South Florida, Inc.*, 451 B.R. 573, 579 (Bankr. S.D. Fla. 2011) (citing *Eastgroup Properties v. Southern Motel Ass'n, Ltd.*, 935 F.2d 245, 248 (11th Cir. 1991)). Similar to the Foreign Representative seeking an asset freeze in support of the Veil Piercing Action under Brazilian law, a U.S. trustee may commence an action against non-debtors for substantive consolidation. *Id.* at 581-82; *see also Bonham v. Compton (In re Bonham)*, 229 F.3d 750 (9th Cir. 2000) (holding that a court may order substantive consolidation of debtor and non-debtors); *Roberts v. J. Howard Bass & Asscs. Inc. (In re Bass)*, No. 10-01101-CAG, 2011 WL 722384, *6 (Bankr. W.D. Tex. Feb. 11, 2011) (same); *In re Alico Mining, Inc.*, 278 B.R. 586 (Bankr. M.D. Fla. 2002) (same).

53.     Further, the Bankruptcy Code also expressly authorizes substantive consolidation in the context of Chapter 11 under section 1123(a)(5), which provides that a plan must provide for an adequate means of implementation, including "the merger or consolidation of the debtor with one or more persons." 11 U.S.C. § 1123(a)(5).

54.     Courts have also instituted preliminary injunctions in support of actions for substantive consolidation. *See, e.g. In re SK Foods, L.P.*, 2010 WL 9476207, *19-20 (Bankr. E.D. Cal. Apr. 5, 2010) (granting a preliminary injunction in support of an action for substantive consolidation as well as for fraudulent transfer). Further, courts granted preliminary asset freeze orders in support of actions based on the alter ego theories, which is similar to substantive consolidation. *Seidel v. Warner (In re Atlas Financial Mortgage, Inc.*, Case No. 13-03233, D.E.

36 (Bankr. N.D. Tex. Jan. 14, 2014) (granting asset freeze injunction under section 105); *O'Toole v. Wrobel (In re Roman Sledziejowski)*, Case No. 13-08317, D.E. 38 (Bankr. S.D.N.Y. Aug. 22, 2013) (same).

### iii.  *The Relief Requested Sufficiently Protects the Interests of the Debtors, the Creditors and Respondents*

55.    The concerns addressed by section 1522 are not present here as the interests of the Debtors, creditors and the Respondents are sufficiently protected if relief is granted under section 1521.

56.    Recognition of the Brazilian Orders are in the best interests of the creditors as it would permit  enforcement of the asset freeze instituted by the Brazilian Bankruptcy Court to preserve the status quo until resolution of the Veil Piercing Action. The Brazilian Bankruptcy Court expressly stated that the "[t]he danger of delay is clear" and that relief is granted in part to prevent dissipation of the assets deviated from the Debtors' estates. Ex. A, at Ex. 3. As the Respondents are believed to possess assets in the United States, recognition of the Brazilian Orders is necessary and essential to give effect to the Brazilian Orders. In other words, failure to recognize the Brazilian Orders would render them meaningless as to the Respondents' assets in the United States, as the Foreign Representative would not be able to enforce the Brazilian Orders to preclude the transfer of Respondents' assets in the United States.  In this regard, the relief requested here is no different than the relief granted by various bankruptcy courts recognizing foreign reorganization plans and enforcing injunctions to implement them and give them effect in the United States. *See In re Olinda Star*, 614 B.R. 28 (recognizing BVI's scheme of arrangement and issuing permanent injunction against acts that would interfere with scheme because if injunction was not instituted, one or more entities may take actions inconsistent or in contravention of scheme); *In re Oi*, 587 B.R. at 265-66 (recognizing Brazilian reorganization plan and enjoining

SEQUOR LAW, P.A.

acts in the United States that would interfere with the plan or the accompanying confirmation order because such relief was "essential to the implementation of the restructuring and complete distributions and therefore consummation of the [plan]").

57.     The Respondents' interests are also protected because the recognition of the freeze orders merely implements the orders entered by the Brazilian Bankruptcy Court, thereby maintaining the status quo. Further, the Brazilian Orders authorize the Respondents to manage and use of their assets, as well as the proceeds from their assets, to ensure their family's support.

58.     Accordingly, the Court should exercise its "exceedingly broad" discretion to recognize the Brazilian Orders under section 1521.

### iv.     The Recognition of the Brazilian Orders Constitutes "Additional Assistance" Under Section 1507

59.     The relief requested also constitutes "additional assistance" under section 1507(a) as it is consistent with comity and satisfies the fairness considerations set forth in section 1507(b) to the extent they apply.

60.     Only one of the fairness considerations is implicated by the requested recognition of the Brazilian Orders[1]—whether the additional assistance will reasonable assure "prevention of preferential or fraudulent dispositions of property of the debtor." The recognition of the Brazilian

---

[1]   The other considerations are factors are not implicated by the relief requested in this Motion. The recognition of the prejudgment asset freeze established by the Brazilian Orders does not implicate: (i) the just treatment of all holders of claims against or interests in the debtor's property, 11 U.S.C. § 1507(b)(1), because the relief requested merely seeks to preserve the status quo pending the adjudication of the Veil Piercing Action; (ii) the protection of claim holders in the United States against prejudice and inconvenience, 11 U.S.C. § 1507(b)(2), because there are no known US creditors; or (iii) the Debtors' opportunity for a fresh start, 11 U.S.C. § 1507(b)(5), because the purpose of the Debtor's Brazilian Bankruptcy Case is liquidation, not reorganization. Further, the factor addressing whether the distribution of proceeds of the debtor's property substantially in accordance with the U.S. bankruptcy law, 11 U.S.C. § 1507(b)(4), has already been addressed by other bankruptcy courts, which have held that the distribution scheme under Brazilian law is similar to that of the United States. *See In re Oi*, 587 B.R. at 268-69.

Orders would give effect to the asset freeze in the United States, thereby ensuring that the Respondents do not transfer or otherwise dissipate assets obtained from the Debtors.

### III.    Recognition of the Brazilian Orders is Warranted Under 11 U.S.C. § 1521(a)(3)

61.    Alternative to recognition pursuant to sections 1521(a)(7) and 1507, the Court should enter an order consistent with the terms of the Brazilian Orders pursuant to section 1521(a)(3) as the Veil Piercing Action satisfies the standards applicable to an injunction.

62.    Under section 1521(a)(3), the Court may "suspend[ ] the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent the right has not been suspended under section 1520(a)." 11 U.S.C. § 1521(a)(3).

#### A.    The Respondents Are Debtors Under Section 1521(a)(3)

63.    The Court may award relief against the Respondents under section 1521(a)(3) as the Respondents are "debtors" under that section.

64.    The definition of "debtor" in a Chapter 15 case "means an entity that is the subject of a foreign proceeding." 11 U.S.C. § 1502(1). In turn, a "foreign proceeding" is defined as a "collective judicial or administrative proceeding in a foreign country, *including an interim proceeding*, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation." 11 U.S.C. § 101(23) (emphasis added).

65.    The Veil Piercing Action constitutes an interim proceeding under section 15021(a). In interpreting Chapter 15, which is based on the UNCITRAL Model Law on Cross Border Insolvency (the "Model Law"), courts have relied on the Guide to Enactment to the UNCITRAL Model on Cross-Border Insolvency (1997, as amended) (the "Guide to Enactment") for guidance. *British Am. Ins. Co. v. Fullerton (In re British Am. Ins. Co.)*, 488 B.R. 205, 212 (Bankr. S.D. Fla.

2013) (noting that "[i]nternationally uniformity is a primary goal of the Model Law and thus of chapter 15" and that the "House Report contemplates courts looking to the Guide to Enactment and the Reports cited therein to aid the courts in achieving a uniform interpretation of chapter 15"); *see also In re Ace Track Co.*, 556 B.R. 887, 897 (Bankr. N.D. Ill. 2016) (noting that legislative history of BAPCPA "makes clear that Congress expected the Guide to Enactment of the Model Law … to be consulted" when interpreting Chapter 15). The spirit of uniformity is also reflected in the statute, as section 1508 provides that "[i]n interpreting this chapter, the court shall consider its international original, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions." 11 U.S.C. § 1508.

66.     Paragraph 79 of the Guide to Enactment provides direction as to whether an action is an "interim proceeding" as follows:

> Such proceedings are often conducted for weeks or months as "interim" proceedings under the administration of persons appointed on an "interim" basis, and only some time later would the court issue an order confirming the continuation of the proceedings on a non-interim basis. The objectives of the Model Law apply fully to such "interim proceedings" (provided the requisites of subparagraphs (a) and (d) are met); therefore, these proceedings should not be distinguished from other insolvency proceedings merely because they are described as being of an interim nature.

Guide to Enactment, ¶ 79. The Guide to Enactment suggests that the inclusion of "interim proceeding" is intended to cover the practice of many countries of opening insolvency proceedings on an interim or provisional basis.

67.     This is consistent with the practice and procedure under Brazilian law to pierce a debtor's corporate veil to extend the effects of its bankruptcy to a third parties. Though the remedy sought is the consolidation of the third parties with the debtor's estate, resulting in the addition of the third parties as debtors, the judicial administrator may obtain provisional relief in aid of his action. The Veil Piercing Action followed this process. After the Foreign Representative filed the

24

Veil Piercing Action seeking to extend the Debtors' bankruptcy upon the Respondents, the Brazilian Bankruptcy Court entered the asset freeze orders to preserve the potential assets for the benefit of the Debtors' creditors.

68.     Further, as the assets of the Respondents are subject to the control of the Brazilian Bankruptcy Court under the Veil Piercing Action for the purpose of the Debtors' liquidation, the Veil Piercing Action is an interim proceeding that satisfies the requirements of "foreign proceeding" under section 101(23). Accordingly, the Respondents are "debtors" under section 1502(1).

### B.     An Asset Freeze in Support of the Veil Piercing Action is Warranted

69.     The Court should enter an asset freeze injunction in the form of the Brazilian Orders as the preliminary asset freeze entered in the Veil Piercing Action satisfy the elements for the imposition of an injunction. *See* 1521(a)(3) & (e).

70.     To obtain relief under section 1521(a)(3) & (e), the Foreign Representative must demonstrate (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction is issued; (3) the threatened injury to the moving party outweighs whatever damage the proposed injunction might cause the non-moving party; and (4) if issued, that the injunction would not be adverse to the public interest. *BellSouth Telecommunications, Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 968 (11th Cir. 2005).

71.     ***The likelihood of success on the merits***. The Brazilian Bankruptcy Court has assessed this initial element as it reviewed the complaint in the Veil Piercing Action and the documentary evidence provided in granting the preliminary asset freeze order. Further, as stated by Mr. Lucidi, the standard to obtain provisional injunctive relief is similar to that in the US as it requires a showing that the plaintiff is likely to succeed on the merits of the underlying claim, the

plaintiff would be prejudiced if the relief is not granted, and that the relief does not cause irreversible damage. The Brazilian Bankruptcy Court held that "[h]aving reviewed the facts, we find that the allegations are verisimilar and supported by detailed evidence and, at this first stage, a demonstration of acts that led to the misuse of the corporate entity to, in principle, defraud creditors." Ex. A, at Ex. 1. The court also held, in connection with the Respondent companies, that "[t]he satisfaction of the requirements for a comprehensive reverse disregard of the ostensible and dormant partners of other legal entities has been evidenced, as well as the need to ensure the amount stated in the complaint as that deviated from the corporate [R]espondents." Ex. A, at Ex. 1.

72.    ***Irreparable Injury***. The Debtors' estate would suffer irreparable injury if the provisional asset freezes are not implemented in the United States. The Foreign Representative would be unable to enforce the Brazilian Orders in the United States unless this Court enters an order restricting the Respondents' ability to transfer their assets located in the United States. Given the Respondents' history of looting the Debtors while the Debtor's reorganization cases were ongoing, as the Brazilian Bankruptcy Court indicated, the "danger of delay is clear" because the Respondents "may conceal assets once again to the detriment of the community of creditors." Ex. A, at Ex. 1.

73.    ***The Balancing of the Harms***. As indicated, the Debtors' estate runs the risk that the Respondents will not abide by the terms of the Brazilian Orders and may transfer away their US assets, leaving the Foreign Representative without a mechanism to enforce the Brazilian Orders in the United States. On the other hand, the Respondents are likely not harmed by the proposed asset freeze as it (i) is consistent with the terms of the Brazilian Orders and therefore preserve the status quo; (ii) is preliminary until the resolution of the Veil Piercing Action; and (iii) provides for

the management and use of the assets as well as the disposal of the proceeds of the assets.

74. ***Public Interest***. As indicated above, the injunction is not adverse to public interests as it is consistent with the aims of Chapter 15 and, more importantly, it is relief that is also available to a trustee in the United States.

## <u>CONCLUSION</u>

WHEREFORE, the Foreign Representative respectfully requests that the Court enter an Order (i) recognizing and giving effect to the Brazilian Orders in the United States, (ii) implementing an asset freeze of the Respondents' assets located in the United States, and (iii) granting such other and further relief as the Court deems just and proper.

I HEREBY CERTIFY that a true and correct copy of the foregoing has been served on June 22, 2021 upon all interested parties registered to receive notice via this Court's CM/ECF electronic notification system.

Dated: June 22, 2021.

Respectfully submitted,
SEQUOR LAW, P.A.
1111 Brickell Ave., Suite 1250
Miami, Florida 33131
Telephone:    (305) 372-8282
Facsimile:    (305) 372-8202
lblanco@sequorlaw.com
jmendoza@sequorlaw.com

By: */s/ Leyza F. Blanco*
  Leyza F. Blanco
  Florida Bar No. 104639
  Juan J. Mendoza
  Florida Bar No.: 113587

27